# EXHIBIT A

MARCH 2, 2012

## COMMONWEALTH OF MASSACHUSETTS

## DIVISION OF ADMINISTRATIVE LAW APPEALS

## BUREAU OF SPECIAL EDUCATION APPEALS

---

IN RE:   PEMBROKE PUBLIC SCHOOLS

BSEA #12-0507

---

BEFORE

SARA BERMAN

HEARING OFFICER

SEAN GOGUEN, ATTORNEY FOR THE PARENT

DORIS EHRENS, ATTORNEY FOR THE SCHOOL

COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

In Re: Pembroke Public Schools                    BSEA #12-0507

DECISION

This decision is issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 USC Sec. 1400 et seq., Section 504 of the Rehabilitation Act of 1973 (29 USC Sec. 794); the Massachusetts special education statute or "Chapter 766," (MGL c. 71B) and the Massachusetts Administrative Procedures Act (MGL c. 30A), as well as the regulations promulgated under these statutes.

On July 13, 2011, Parents filed a hearing request with the Bureau of Special Education Appeals (BSEA) alleging that the Pembroke Public Schools (Pembroke or School) was failing to provide the Student with a free, appropriate public education (FAPE). Specifically, Parents alleged that Student's dyslexia and resultant academic deficits are so severe, and have been addressed by Pembroke so inadequately, that Student now requires placement in an out-of-state residential educational program. In their hearing request, Parents asked the BSEA to order Pembroke to fully fund a residential placement for Student at the Kildonan School in New York. The School responds that the Student is making effective progress within Pembroke's program for children with language-based learning disabilities, and does not require an outside placement.

The parties requested and were granted several postponements of the hearing date for good cause. A hearing took place on December 7, 16 and 20, 2011 at the offices of the Bureau of Special Education Appeals (BSEA) in Malden, MA. Both parties were represented by counsel. Each party had an opportunity to examine and cross-examine witnesses and submit documents into the record. The record consists of Parents' exhibits P-1 through P-20, School's exhibits S-1 through S-40, tape recorded testimony and argument, and the written transcript created by the certified court reporter. At the parties' request, the conclusion of the hearing was postponed to January 13, 2012 for submission of written closing arguments and the record closed on that day.

Those present for all or part of the proceeding were:

Parents
Elaine Lord                      Parent Advocate
Susan M. Brefach, Ed.D.          Psychologist
Geri Feuer Shubow                Audiologist
Aron Blidner, Ph.D.              Secondary Special Ed. Coordinator, Pembroke
Michael Murphy                   Asst. Dir. Pupil Personnel Services, Pembroke
Rosemary Kiley                   Learning Specialist, Pembroke

| Beth Asmas | Science teacher, Pembroke Comm. Middle School |
|---|---|
| Rachel Dresser | Math teacher, Pembroke Comm. Middle School |
| Julianne Gearing | Social Studies teacher, Pembroke Comm. Middle School |
| Linda Reichenbach | Evaluator, Pembroke Public Schools |

| Sean Goguen, Esq. | Counsel for Parents |
|---|---|
| Doris M. Ehrens, Esq. | Counsel for School |
| Sara Berman | BSEA Hearing Officer |
| Christine M. Lo Schiavo | Court Reporter |
| Amie Rumbo | Court Reporter |

## ISSUES PRESENTED

1. Whether the IEP and services for seventh grade (2011-2012) are reasonably calculated to provide the Student with FAPE, or can be made appropriate?

2. If not, whether the Student requires residential placement at the Kildonan School in New York in order to receive FAPE;

3. Whether Pembroke provided the Student with FAPE in sixth grade (2010-2011)

4. If not, whether Student is entitled to a placement at Kildonan as compensation for denial of FAPE in sixth grade.

## POSITION OF PARENT

Student is an intelligent and motivated seventh grade student with a complex and severe learning disability encompassing depressed phonological processing skills, as well as both visual-spatial and central auditory processing disorders, all of which interfere with his literacy and overall academic performance. Although Student has received special education services from Pembroke since second grade, these services have been so inadequate and/or inappropriate that Student arrived in middle school with virtually no functional literacy or independent academic skills. Student is suffering emotionally as a result of his inability to read or perform educationally; he feels stigmatized and isolated.

Student requires a highly intensive, self-contained, fully integrated language-based program, grouped with peers with similar profiles, for all academic subjects, in order to make effective progress. Pembroke does not provide such a program. Further, there are no programs in Massachusetts which would provide the Student with the intensity of services that he needs to make such progress. The Kildonan School in New York is the closest program available that can meet the Student's needs.

## POSITION OF SCHOOL

While there is no dispute that the Student has significant learning disabilities, he is making effective progress in his current program at the Pembroke Community Middle School, socially, emotionally and academically.  He does possess literacy and academic skills.  These skills are not all at grade level, which is to be expected in light of his disability, but Student is making steady progress in Pembroke's program, both within and outside of the general education classroom, and is an enthusiastic and motivated participant in school.

Student experienced some struggles in sixth grade not because his services were inappropriate, but because the family moved and he had to change schools (within Pembroke).  Even in sixth grade, Student adjusted to his move and made progress in Pembroke's program.  Student is receiving even more services for seventh grade.

Parents rely on a single session of outside testing that was performed in sixth grade, under anxiety-provoking conditions, to support their quest for a highly restrictive, residential placement, and paint a picture of an anxious, unhappy child.  Student presents as far happier and academically capable in school than he reportedly does at home, probably because of Parents' and the outside evaluator's negative expectations and perceptions rather than because of any deficiencies in Pembroke's program.

### FINDINGS OF FACT

1. Student is a 13-year-old seventh grader[1] who lives within the Pembroke Public School District and attends the Pembroke Community Middle School.  Student's eligibility for special education and related services is not in dispute.  Student is described as a friendly, outgoing, and caring child with many interests including history, current events and music.  Student plays team sports in town leagues and also plays an instrument.  (Parent)

2. Student has at least average intellectual ability, but also has significant language-based learning disabilities affecting his performance in reading, writing, spelling, and math.  Student also has had some problems with anxiety over schoolwork and, coping with stresses appropriately.  According to Parent, as of the date of hearing, Student still could not read street signs or menus, or write down a telephone message.  Parent testified that although the Student has friends, he feels stigmatized and isolated, and that he feels "stupid" because of his reading and academic difficulties.  (Parent)  The School agrees that the Student has language-based learning disabilities, although School personnel do not perceive Student to be as impaired as Parents do.  (Kiley)

3. Student's seventh-grade IEP, covering the period from May 24, 2011 to June 4, 2012, calls for Grid C services in English Language Arts (ELA), Reading, Learning Center and weekly counseling, Grid B services in Social Studies, Science and Math, and

---

[1] Student was 12 years old at the time of the hearing.

summer services. The IEP was amended in August 2011 to add additional hours of summer service plus two extended school day sessions per week. (S-4, 4A)

4. Parents accepted the services in this IEP but rejected the IEP and placement. Parents assert that the services are not sufficiently intense, that the IEP contains inappropriate goals, benchmarks, and accommodations, places Student with inappropriate peers, and fail to incorporate the recommendations of the outside evaluator retained by the Parents. (P-4A)

5. According to the record, Student entered the Pembroke Public Schools in second grade, and was provided with his first IEP at that time. Student has had IEPs from that time to the present to address his difficulties with reading, writing, and math. Additionally, the IEPs had a counseling component to assist Student with coping skills. (Parent, S-4—S-7)

6. Student had attended the "A" elementary school in Pembroke through fifth grade (2009-2010). He transferred to the "B" elementary school, also in Pembroke, at the start of sixth grade (2010-2011), which was his last year of elementary school, because the family had moved and because the Parents had heard that the "B" school might have more services available for the Student. (Parent)

7. Prior to April 2011, the Parents had fully accepted all of the IEPs that Pembroke issued for Student. In April 2011, Parents revoked their acceptance and partially rejected the previously-accepted 2010-2011 sixth grade IEP about a month before it was scheduled to expire. Parents had come to believe that this IEP was not appropriate, based on their own assessment of Student's progress and the opinion of an outside evaluator, Dr. Susan Brefach. (Parent)

8. Pembroke last conducted a three-year evaluation in May 2009, when Student was in fourth grade at the "A" elementary school. Testing with the WISC-IV showed Student to have solidly average cognitive ability. (S-11).

9. On the Woodcock-Johnson III Test of Achievement (WJ-III ACH) Student performed solidly in the "average" range[2] in Oral Expression, Listening Comprehension, Phoneme/Grapheme Knowledge, Math Calculation, Math Reasoning, Academic Knowledge, Academic application, and Written Expression, with standard scores (SS) ranging from 90 to 115. He scored in the "below average" range in Basic Reading Skills (SS of 84) and Reading Comprehension (SS of 79). (S-11)

10. On the Test of Written Language (TOWL-3), Student scored in the "average" range in 3 of 8 subtests (Style, Sentence Combining, and Story Construction) and "below average" on the remaining 6 subtests (vocabulary, Spelling, Logical Sentences, contextual Conventions and Contextual Language). (S-11)

---

[2] "Average" scores are between 85 and 115.

4

11. Composite scores on the TOWL-3 were "below average" for Contrived Writing and Overall Writing and "Poor" for spontaneous writing. (S-11)

12. Standardized testing of pragmatic language showed average ability; however, criterion-based testing of functional use of pragmatic skills showed that he was not consistently using those skills. (S-11)

13. In June 2009, the School developed an IEP to implement this three-year evaluation during the fifth grade (2009-2010). This IEP noted that Student needed to be taught reading at his then-present DRA level of 20 (approximately at a late second grade level at the end of fourth grade), and called for "an intense, rule-based phonics program during guided reading time" and a modified rule-based spelling program. The IEP contained goals in Reading, Written Language, Coping Skills, Work Habits and Mathematics. Grid C services included Reading, ELA and Social Skills. Math was in Grid B. The IEP also provided for summer services. Parents accepted this IEP in full. (S-6)

14. Student received services during the summer after fourth grade (summer 2009). When he entered fifth grade in September 2009, his DRA reading level had dropped from 20 to 16. (P-8f)

15. The annual Reading goal for fifth grade was for the Student to "improve his oral reading fluency to one year's progress according to the Diagnostic Reading Assessment. The level would be 34 and the grade approximation is end of third grade." (S-20) As of May 2010, that Student had progressed to DRA Level 28 (late second to early third grade level.

16. The annual Writing goal was to "construct a written response that includes proper organization of ideas and punctuation and mechanics with a proficient score as measured by a grade level rubric." (S-20) As of March 2010,[3] Student could formulate strong topic sentences and had "many great ideas" for written work (which had been the case at the end of fourth grade), but required significant support with editing (punctuation), his handwriting was difficult to read, and he needed a scribe for long assignments. (P-8(g))

17. Student's final grades for fifth grade at the A elementary school were all in the "B" range. Grades in Reading, Language Arts, and Composition were based on modifications to the general curriculum and performance criteria as well as test accommodations. (S-16)

18. Student's fifth grade MCAS scores for ELA, Math, and Science and Technology were all in the "Needs Improvement" range. (S-5)

19. Student's IEP for sixth grade (2010-2011), issued in May 2010, described Student as a "friendly and outgoing" student who conversed easily with adults and peers, had a

---

[3] The record contains no year-end progress report for 2009-2010

good sense of humor, and good comprehension and retention of material presented orally. Student needed support to apply learned decoding strategies when reading, and struggled to remember spelling words or to use correct grammar, capitalization, and punctuation when writing. Accommodations included small group instruction when necessary, a scribe for written work "as needed," chunking work into smaller units, preferential seating, reading tests to Student as needed, reference sheets and graphic organizers for writing, and grade level texts on CD or tape when necessary. Student was to be provided a "rule based phonics program," along with repetition and clarification of directions.

20. Student's annual reading goal was to reach DRA Level 40 for comprehension and fluency. His writing goal was to write a multi-paragraph essay at a "proficient" level according to a grade-level rubric. His math goal was to increase his ability to solve grade-level word problems. (S-5)

21. As in prior years, the IEP contained a problem-solving skills goal to address Student's tendency to get anxious or upset in stressful situations. He had made considerable progress over the years in this area, but still needed some guidance. (S-5)

22. The service grid for sixth grade provided for math services in the B grid, and ELA and social skills instruction in Grid C. As in the past, this IEP provided for summer services. (S-5)

23. Parents accepted this IEP in full in June 2010. (S-5)

24. Student started sixth grade in the "B" elementary school because his family had moved. (Parent)

25. During sixth grade, Student received ELA, Math and Writing instruction (as well as science and social studies) in the inclusion class, co-taught by a regular education teacher and Ms. Kiley. (Kiley) He received pullout services in Wilson Reading and Kurzweil training. (Kiley)

26. The sixth grade progress report in Reading for December 2010 stated that Student had made a good transition between schools, was an "active participant" in class, but "struggles tremendously with reading. His decoding of words is very difficult…When the passages are read to him he is very insightful answering comprehension questions. He does experience anxiety and even anger if he does not understand the directions." In writing, the December progress report indicated that Student "very much enjoys writing, however his mechanics are very poor. He needs a scribe or keyboard to get his thoughts down on paper. ((P-8d)

27. The next progress report in Reading, issued in March 2011, was worded identically to the prior report and did not indicate what progress, if any, the Student had made. The only difference between the December and March progress reports for Writing was that Student's class was reading different novels during each period. (P-8d)

28. The June 2011 progress report for Reading indicated that Student "has difficulty decoding, but he has improved as he is applying learned strategies." His DRA score for May 2010 was 38 (late third grade level at the end of sixth grade.) The report stated that "a multi-sensory reading program will continue to benefit [Student] as he moves to [middle school]. (P-8b) In Writing, Student continued to have good ideas for writing, was able to comprehend text using by using context cues and making inferences, but still had "very poor" mechanics. Student had "a great deal of success" using a keyboard, and also used a scribe at times. Student continued to "get very frustrated" with the amount of time he needed to complete tasks." (P-8b)

29. Ms. Kiley, the Learning Specialist in Student's sixth grade inclusion classroom, testified at length about Student's experience during 2010-2011. Ms. Kiley is a certified special education teacher with a Master's degree in special education, 20 years of experience as a regular education teacher and approximately seven years of experience as a Learning Specialist.  (Kiley)

30. Ms. Kiley testified that when the Student first entered her class in September 2010, his reading level was "very low" and that he was "struggling" with decoding and fluency. He needed much help with decoding, and far-point copying. At the start of the year he was "very, very extremely disorganized. " (Kiley)

31. Ms. Kiley further testified that she was very concerned about Student's emotional status, stating that Student was "very upset about leaving his other school. He was having a lot of emotional problems, and he just needed someone to talk to and just become comfortable with. So I really wanted to help him acclimate to the classroom, make new friends, and just feel like he fit in. He was struggling in so many areas and the entire curriculum basically." (Kiley).

32. As of December 2010, Ms. Kiley informed the B school administration that she felt that Student needed more instruction and support than he was currently receiving from her in the inclusion setting, and possibly needed a self-contained language-based classroom. Additionally, Ms. Kiley was "extremely concerned about his behavior and mannerisms that are inappropriate for a sixth grader." Specifically, Ms. Kiley observed that Student had problems with peers, felt he was being bullied, and responded inappropriately to other students. He was seeing the school psychologist for assistance with this issue. (Kiley, P-6, p. 15)

33. Based on these concerns, which Parents shared, the School convened a meeting with Parents on or about December 10, 2010. At this meeting, School personnel suggested having Student move to the substantially-separate language-based classroom located in the same school building. Parents agreed to try this change. The parties agreed to prepare Student for the transition, which would be made in January 2011, after the winter break. The change in placement did not take place, however. The Student was upset about leaving Ms. Kiley and his classmates, and Ms. Kiley felt he was benefiting from her instruction in the inclusion setting. Ultimately, the Parents and

School agreed to have Student go to the language-based classroom only for daily instruction in Wilson reading as well as Kurzweil training. (Parent, Kiley)

34. The Wilson reading teacher, Ms. Stack, did not testify at the hearing. The record contains no reports written by Ms. Stack regarding Student's progress in her class.

35. According to Ms. Kiley, Student made slow, steady progress in sixth grade. Specifically, he adjusted to his change in schools, made friends, became happier, and began to feel that he was part of the school community. He "participated in" literature circles, at times reading aloud from the text being used by the class, and also participated in other class activities. His reading improved, to a late third-grade level on the DRA. (Kiley)

36. On cross examination, Ms. Kiley acknowledged that by the end of sixth grade, Student was still struggling with reading, writing, and organizational skills, as well as with organization, time-management, and the ability to cope with frustration, and needed a great deal of teacher support with academics, but felt that he had improved since the start of the school year. He had good answers to reading comprehension questions, if the questions were read to him. His test questions were modified to reduce his frustration, so that he would not shut down. (Kiley)

37. Ms. Kiley communicated frequently with Parents during sixth grade, calling them by phone approximately every other week. Parents appreciated Ms. Kiley's work with Student, but continued to be concerned about his rate of progress, especially in reading, and felt that his self-esteem was suffering. (Parent)

38. In April 2011, Parents had Student privately evaluated by Susan Brefach, Ed.D. Dr. Brefach holds a doctorate in counseling psychology. She is a Massachusetts-licensed psychologist and DESE-certified school psychologist. Dr. Brefach has approximately twenty years of experience providing evaluations and treatment to children and adults in a variety of settings. Her CV includes as an area of expertise "neuropsychological, educational and personality assessments of individuals aged 2 and up with combinations of cognitive, emotional, behavioral and/or learning difficulties..." (P-1)

39. Dr. Brefach reviewed prior IEPs and school evaluations, interviewed Parent and Student, and conducted a battery of standardized tests, and produced a report of her findings and recommendations. Dr. Brefach elaborated on her report in her testimony. (P-1, Brefach)

40. As he had in the past, Student scored in the average range on the WISC-IV. He showed strength in verbal reasoning, vocabulary, and social judgment, and relative weakness in some visual tasks and mental flexibility. Dr. Brefach found that Student's anxiety may have reduced his test score. She concluded that Student had "signs of a visual spatial learning disability, in the context of good intelligence."

41. Based on the result of the WISC-IV plus several other tests of cognitive functioning, Dr. Brefach concluded that Student had "at least average cognitive ability, with signs of better potential as well as significant neurological interference with learning." Student had "some linguistic weaknesses in his auditory memory span, skills for word retrieval, and auditory processing skills. Further, Student had "significantly impaired" skills in visual-spatial analysis and synthesis, "consistent with a diagnosis of a visual spatial learning disability." Student "struggled with directionality, spatial integration, part/whole relationships, attention to visual detail, visual-motor integration, and visual symbolic memory." (P-1)

42. According to the report, these weaknesses "raised significant concern about his ability to acquire academic skills within a standard setting." (P-1) Dr. Brefach explained in testimony that the auditory weaknesses would interfere with Student's ability to remember or process lectures, instructions, and other orally-presented information in the classroom. (Brefach)

43. Dr. Brefach further explained that the Student's deficits in visual-spatial processing and memory resulted in "difficulty making sense of what he sees and reproducing it," which would impair Student's performance in writing, word identification, spelling, reading fluency, and aspects of math. Dr. Brefach noted that the combination of auditory and visual weaknesses resulted in a child with "both dysphonetic and dyscidetic" dyslexia, which not found in all individuals with dyslexia, and which makes compensation much more difficult than for persons who only have impairments in one area. (Brefach)

44. According to Dr. Brefach, the implications of this combination for Student were that he could use neither visual nor auditory channels effectively for reading. She found that Student demonstrated this deficit in his academic testing. He made many errors in reading sight words accurately. His silent reading comprehension (on the Gates-MacGinitie) was poor; he was "incorrect on nearly all of the [comprehension] questions attempted, which were below a fourth grade level." (Brefach)

45. The report contained results of academic tests, which indicated that Student was generally performing well below average, as follows:

- CTOPP: phonological awareness—12th %ile; phonological memory—21st %ile; rapid naming—8th %ile; total 12th%ile.

- TOWRE—form B: sight word efficiency—6th %ile (G.E. 2.6); reading phonemes—2d %ile (G.E. 1.8); total—2d % ile.

- WRAT-IV: Word Reading Subtest—2d %ile (G.E. 1.6); Spelling Subtest—3d %ile (G.E. 2.0); Math Computation Subtest—19th %ile (G.E. 4.6)

- GORT-IV: Rate—2d %ile (G.E. 3.0); Accuracy—2d %ile (G.E. 3.0); Overall fluency—below 1st %ile (G.E. 2.7); Response to orally-read comprehension

questions—16th %ile (G.E. 4.2)  Complete lack of automaticity or fluency in his reading.

- Gates-MacGinitie Silent Reading Comprehension Test—Level 4; correct responses to 4 of 25 questions, test discontinued due to child's anxiety.

- TOWRE-III:  Four years below grade level expectations; writing sample unreadable due to poor handwriting, no spacing, no capitals, spelling errors.

- Key Math Diagnostic Arithmetic Test-III:  Basic Concepts—6th %ile (G.E. 3.4); some evidence of number sense and conceptual understanding, few pragmatic math skills.

- Tests of Emotional Functioning:  Strong secondary emotional reaction to learning disabilities; struggles to use intelligence to solve multistep or complex problems; emotionally fragile and overreactive; becomes 'tense, emotionally brittle and displays reduced persistence and flexibility" when he perceives tasks as difficult; significantly anxious and emotional vulnerable, anxious about performance, aware of academic deficits, does not identify as someone who does well in school, at risk for further deterioration in functioning:

46.   Dr. Brefach's report concluded that Student's "academic skills are consistent with a diagnosis of developmental dyslexia in the context of good intelligence."  She described Student as both "dysphonetic and dyseidetic," i.e., unable to use either sound-symbol relationships or visual patterns to decode words.  "He does not have an area of strength to use in compensating for his reading disability, and is thus highly at risk for a lack of progress in reading skill, unless he is provided with highly specialized and intensive instruction." (P-1)

47.  Dr. Brefach's report further concluded that "at the present time, [Student] remains essentially a non-reader…He is essentially illiterate…" and "does not have the necessary skills to read text independently, produce independent written work, or solve math problems at anything approaching grade level." He is "increasingly discouraged and withdrawn" because of his awareness of his deficits. (P-1)

48.  She further concluded that "the severity of his learning disabilities and his dyslexia argue for a much higher level of remedial instruction and classroom accommodation. He is at risk for remaining functionally illiterate, without the necessary skills for independent living or employment." (P-1)

49.  When asked to explain her conclusion that Student was "essentially illiterate," or "functionally illiterate," Dr. Brefach testified as follows:

> Functional literacy is roughly defined as somewhere north of a sixth grade reading level.  It allows you to fill out a job application and

read the *Boston Globe*, not the *New York Times*…[which]…is at a
ninth grade level.

So I've got a youngster who's twelve-and-a-half, bright kid, my
testing, objective testing, no help, no cues, no practice. He's
performing at a mid to late second grade level in reading after six
years of school. You do the math…He doesn't get to a sixth grade
level by the time he's out of school. How is this kid supposed to
perform in the adult world without a level of functional skill…I said
he was at risk for remaining functionally illiterate, which is where
he was when I tested him…[T]hat is stronger language than I
normally use, but I was extremely concerned, and I remain
extremely concerned. (Brefach)

50. Dr. Brefach opined that Student's then-current program was highly inadequate, and
that Student needed to be placed in a "full day, structured, psychosupportive,
substantially separate language-based program designed to meet the needs of bright
students with learning disabilities." (P-1) In Dr. Brefach's opinion, Student needed a
program that provided individual daily tutorials using Orton-Gillingham to acquire
reading skills; she felt that for Student, Wilson would not be sufficiently intensive.
(Brefach)

51. Further recommendations included:

- Classes of eight or fewer students with profiles similar to Student;

- Fully multisensory, language-based instruction in all areas of the curriculum by
teachers experienced in working with children with learning disabilities;

- Simplified and remedial instruction for academic areas that are visual or spatial in
nature; visual simplification of all instructional materials so they can be
understood by a child with visual learning disability;

- Modification of all reading material to current level of reading skill;

- Daily individual reading tutorial by a certified Orton-Gillingham reading
specialist, to teach decoding and encoding words, skills for identifying and
spelling words, and practice with fluency and comprehension;

- Daily individual tutorial in written language using writing process approach as
well as computer programs;

- Instruction in keyboarding;

- Small, highly structured math class using a sequential teaching approach; mastery
of basic arithmetic as a prerequisite for more abstract areas of math;

- Parental monitoring of Student's emotional status.

52. In May 2011, Pembroke convened a Team meeting to review Dr. Brefach's report and develop an IEP for the remainder of sixth grade and for seventh grade (2011-2012). (S-4) At this meeting, Parents requested an outside placement; the School disagreed. (P-3)

53. The resulting IEP was issued on May 25, 2011. (S-4) The Narrative Description of School District Proposal (Form N-1) stated that the Student could be served at Pembroke Community Middle School (PCMS) for seventh grade, and did not require an outside placement as requested by Parents. The N-1 Form further stated that "[a]lthough [Student] is making relative progress, it is the Team's opinion that Student should be provided with more small group instruction to facilitate reading progress. The Team discussed [Student] attending the Language Based Classroom at PCMS, which will provide small group instruction during Reading and ELA. The Team also discussed that Student be provided with support during Math, Social Studies and Science, as well as specialized, research-based reading instruction such as Orton-Gillingham…on a consistent basis. (P-3)

54. The Strengths and Key Evaluation Results Summary briefly summarizes Dr. Brefach's findings on cognitive testing, but does not mention the academic testing. The only mention of academic levels in this section is Student's score at Instructional Level 38 on a recently-administered DRA. (S-4) The IEP notes that Student's comprehension skills are good when material is presented orally; that he enjoys creative writing and must type written assignments because of struggles with handwriting; that Student has some problems with peers because of his difficulty with reading social cues and some difficulty regulating his emotions when stressed; that his reading is progressing but he still needs to learn to apply decoding strategies; that he can complete grade level work with modifications in science and social studies; tests and quizzes are read to him (S-4)

55. Accommodations listed in the IEP include provision of a structured environment, provision of a model for copying, organizational strategies for assignments, chunking work into smaller units, reading tests to Student when necessary, reading grade level materials to Student, and additional, similar accommodations. (S-4)

56. MCAS accommodations included individual test administration, clarification of test instructions, use of a place marker, test administrator reading test items aloud except for ELA Reading Comprehension test, use of scribe or speech to text conversion device for open response and multiple choice questions, graphic organizer, checklist, individualized Math reference sheet, electronic text reader for ELA Reading Comprehension and Mathematics test, use of multiplication and division charts, table.. (S-4)

57. The IEP contains goals in ELA, Reading, Math, and Coping/Problem Solving Skills. The ELA goal was for Student to answer open response questions about text in paragraph form, with topic sentence, content, and concluding paragraph, including inferencing and prediction, with two or fewer teacher prompts. Benchmarks included application of strategies, completion of graphic organizers, utilization of context cues and editing rubrics, utilizing text to speech software for editing. (S-4)

58. The Reading goal was for Student to improve decoding, fluency, and automaticity when reading passages at his reading level (which was not specifically stated). There was no mention of any specific reading methodology, despite the statement regarding Orton-Gillingham in the N-1.

59. The Math goal was for Student to solve multi-step word and other problems. The Coping/Problem Solving goal was for Student to use counseling and classroom supports to use effective problem solving steps to resolve interpersonal difficulties. (S-4)

60. The IEP called for Social Studies, Science and Math to be taught in the general education classroom by general and special education staff (Grid B). Services in Grid C were Reading (3x48 minutes per 7-day cycle), ELA (7x48 minutes/cycle), Learning Center (7x48 minutes per cycle) summer services (3x45 minutes/cycle from July 5 to August 5, 2011), and Social Skills (1x30 minutes per cycle with a school counselor) (S-4)

61. In a letter from counsel dated July 13, 2011, Parents accepted the services in the IEP but rejected the "sufficiency and appropriateness of this IEP in that it does not meet [Student's] many educational needs…[in that ] it does not provide the intensity and specialized services {Student] needs, it does not provide him with an appropriate peer group, the goals and benchmarks are inappropriate, it does not incorporate the recommendations of Susan Brefach, Ed. D., and the proposed accommodations and modifications are not appropriate. [Parents] also reject the reduction of summer services…" (S-4A)

62. The Parents filed the hearing request in this matter on the same day as they partially rejected the IEP. At the IDEA-mandated resolution meeting the School proposed to amend the IEP to add 2x60 minutes per week of extended school day services to provide additional academic supports as well as 6 additional hours of summer services during August 2011. (S-4b)

63. Student entered seventh grade at PCMS in September 2011 pursuant to the partially rejected IEP referred to above, and was still enrolled there as of the hearing dates.

### School's Current Program

64. Student currently is enrolled as a seventh-grader in the Language Based program at the PCMS. As set forth in his partially-rejected IEP, Student is in a separate classroom for Reading, ELA, and Learning Center, and in general education classes, with special education support, for Science, Social Studies and Math. (Reichenbach)

65. The ELA, Reading, and Learning Center classes are taught by Ms. Linda Reichenbach. Ms. Reichenbach is a certified special education teacher with approximately 17 years of teaching experience. Ms. Reichenbach has a Bachelor's degree in elementary and special education, with a concentration in reading. She also has 27 graduate credits, about 250 hours of workshops and training, as well as 90 hours of training in Wilson Reading.[4] In addition to teaching, Ms. Reichenbach administers diagnostic educational testing for Pembroke, and has conducted approximately 220 to 230 educational evaluations for Pembroke special education students. (Reichenbach)

66. Ms. Reichenbach testified that Student is one of three seventh-grade students in her Reading class, which meets every other day, and uses the Wilson reading method to work on reading fluency. Ms. Reichenbach testified that Student arrived in her class stating that he was unable to read (although she felt that he actually could read), but that with encouragement, has made progress, has increased his confidence, and now considers himself to be a reader. He fully participates in the reading group.

67. As of the hearing, Student was on Book Three of Wilson, working on closed syllables. He was able to decode 12 of 15 words containing two syllables. Ms. Reichenbach administered the DRA to Student in approximately October 2011. She started the test at Level 50 (based on his having been on Level 38 in May 2011 and assuming that he must have finished sixth grade at Level 40). Student had too many errors to be scored at Level 50 or at Level 40; the test was discontinued at that point. He was able to read a fifth-grade passage fairly fluently, after multiple rehearsals. (Reichenbach, S-22) Parent felt he had memorized the passage; Dr. Brefach felt he had memorized part of it. (Parent, Brefach)

68. Ms. Reichenbach also teaches Student's language-based, separate ELA class, where Student is one of a group of six seventh-graders. The class works on literature and writing. For literature, Ms. Reichenbach pre-teaches vocabulary, and works with the students on silent reading and on comprehension strategies. For writing, Student uses graphic organizers with support, and does final drafts independently using a computer. Ms. Reichenbach testified that Student does not particularly like writing, but has made progress. (Reichenbach)

69. Student also participates in the Learning Center, in which Ms. Reichenbach helps students apply strategies to general education work. Student also takes his Math, Social Studies and Science tests in the Learning Center. Ms. Reichenbach and the

---

[4] This 90 hours is necessary to teach Levels 1 through 6 of the 12-level Wilson program. (Reichenbach)

content area teachers modify the tests by, for example, reducing the number of multiple choice items from 4 to 3, or by arranging items on a page to make them visually clearer. In some instances, Ms. Reichenbach reads test questions to Student. (Reichenbach)

70. For Science, Social Studies and Math, Student attends general education, inclusion classrooms. The general education inclusion teachers meet weekly as a team with Ms. Reichenbach to plan and discuss student needs in light of the work being done in each class. (Gearin)

71. In Social Studies, Student is one of several students from the language based program. He is taught by a general education teacher, Ms. Gearin, who has had Landmark School training in accommodating students with learning disabilities. (Gearin) Ms. Gearin is assisted by a classroom special education paraprofessional, who circulates in the room helping students with such tasks as writing down assignments and organization. The paraprofessional sometimes reads material to Student or his classmates. Other classroom modifications for all students on IEPs include teacher-generated two-column notes, and modification of tests (which Student takes in the Learning Center) and assignments, and pre-reading and pre-teaching of vocabulary. Student receives support for writing assignments in the Learning Center. Ms. Gearin testified that Student understands the course content, is very interested in the subject matter, participates in discussions, makes an effort to do written assignments, and has made progress. His first trimester grade was B-. (Gearin)

72. In Science, Student is one of 27 children, seven of whom have IEPs. Ms. Reichenbach began providing classroom support for the students on IEPs in approximately November 2011. As with Social Studies, Student receives accommodations such as modified tests, having some materials read to him, occasional scribing, and taking tests in the Learning Center. The Science teacher, Ms. Asmas feels that Student has made progress in class and understands the material. His first trimester grade was C-. (Asmas)

73. Student is enrolled in a "foundations" Math class, which is the least advanced of the mainstream math classes that still provide grade-level curriculum, which, in this case, includes operations with fractions and decimals. (Dresser) Ms. Reichenbach provides support in this classroom for the students with IEPs,[5] all of whom are in the language-based program. Student and others with IEPs receive accommodations such as teacher-generated notes, lists of formulas, and shortened tests. Student takes most tests and quizzes in the Learning Center. The math teacher believes that Student understands the curriculum and has made progress as shown on tests and quizzes. (Dresser)

74. Student's progress reports for December 2011 indicated that in Reading, Student was making good progress applying decoding strategies to words in isolation, increasing his fluency with practice, and improving his ability to recognize pre-taught words in

---

[5] Of 22 students in the math class, 8 are on IEPs.

text. In ELA, Student was making progress with applying strategies to comprehension, in using graphic organizers and other tools for the writing process. He was also making "good progress" in Math. (S-39)

75. Student's current teachers described him as an active participant in school. He has taken part in sports, has friends, and generally gets along with peers. According to the school counselor's progress report, Student identifies reading and math as stressors but has used strategies to cope successfully. (S-39, Reichenbach, Asmus, Dresser).

76. Parent testified that Student continues to be frustrated with school, cries in the morning before going to school, and is extremely frustrated with homework. (Parent) Parent further testified that both Parents read assignments to Student from an extra set of books, and scribe much or most of his written work because his handwriting is poor and his typing is slow. (Parent)

77. Dr. Brefach observed Student in his Reading and Math classes at PCMS shortly before the start of the hearing in this matter.[6] She testified that the Reading class was described as a Wilson tutorial but did not resemble other Wilson tutorials that she had seen. She noted that Student was one of three students working on Book 3 of the Wilson series, on closed syllables, the very beginning of the Wilson program. She testified that Student was inaccurate in reading and writing about one-third of the three-letter syllables (e.g., confusing T-A-N and T-I-N in assembling syllables).

78. In Dr. Brefach's opinion, Student's performance in his Reading small group indicated that the service was not intensive enough or specialized enough for him to make effective progress; e.g., the Reading instruction needs to be presented individually rather than in a group, and daily rather than on alternate days. (Brefach)

79. Dr. Brefach testified that in Math, Student made visual and auditory errors, as a result of his learning disability, that needed to be corrected, and that he needed more instruction in verbalizing the sequence of problem-solving. She felt that he could not get this level of individualized instruction in the inclusion math class, and that the language in the class was too fast-paced for Student. (Brefach)

## Program Proposed by the Parents

80. The Parents seek to place Student residentially at the Kildonan School in Amenia, New York. Kildonan is a specialized day and boarding school for children in grades 1 through 12 who have at least average intellectual ability as well as dyslexia. Kildonan is chartered and registered by the New York State Board of Regents and is

---

[6] Dr. Brefach had previously observed some seventh grade classes in June 2011, before Student had enrolled, but these were not necessarily the classes that Student ended up attending, and the special education teacher was not Student's current teacher, Ms. Reichenbach; therefore, I do not rely on this observation.

accredited by the New York State Association of Independent Schools; however, Kildonan is not Chapter 766 approved by Massachusetts (P-10)

81. According to pages from Kildonan's website, there is a discrete middle school component, specifically designed to meet the needs of children in grades six through eight. Central to Kildonan's program is its Language Training program, which provides daily individual reading tutorials, using the Orton-Gillingham approach, reinforced by nightly structured study halls. Language Training teachers must complete at least 70 hours of Orton-Gillingham training, in addition to ongoing training during their employment. Content area subjects at the middle school level are hands-on, multisensory and project based with reduced writing demands while writing skills are being remediated. Math classes are aligned with the sequential approach of the language training. Students at Kildonan can participate in extracurricular activities, including intramural sports and interscholastic athletic teams. (P-10)

82. The Parents selected Kildonan based on Dr. Brefach's recommendations; she last visited Kildonan about four years ago, and spoke to an administrator shortly before the hearing. Parents and Student visited Kildonan during summer 2011, and Student has been accepted there. (Brefach)

83. According to Dr. Brefach and Parents, there exists in Massachusetts no appropriate program for Student within a reasonable commuting distance from Pembroke. The usual programs considered are not available and/or appropriate. For example, Carroll School reportedly does not have an appropriate class grouping given Student's age and degree of reading difficulty. Landmark reportedly does not use Orton-Gillingham; further, it is too far from Student's home to commute and does not have a boarding option before ninth grade. Learning Prep School does not provide individual reading tutorials. There was some testimony regarding a language-based collaborative program located in Weymouth (Reichenbach), but no evidence as to whether that program is appropriate for Student or has an opening.

84. Further, there is no evidence on the record regarding any other public or private programs available that might be appropriate for Student.

## FINDINGS AND CONCLUSIONS

There is no dispute that Student is a school-aged child with a disability who is eligible for special education and related services pursuant to the IDEA, 20 USC Section 1400, et seq., and the Massachusetts special education statute, G.L. c. 71B ("Chapter 766"). Student is entitled, therefore, to a free appropriate public education (FAPE), that is, to a program and services that are tailored to his unique needs and potential, and is designed to provide 'effective results' and 'demonstrable improvement' in the educational and personal skills identified as special needs." 34 C.F.R. 300.300(3)(ii); North Reading School Committee v. BSEA, 480 F. Supp. 2d 489 (D. Mass. 2007); citing Lenn v. Portland School Committee. 998 F.2d 1083 (1st Cir. 1993).

While Student is not entitled to an educational program that maximizes his potential, he is entitled to one which is capable of providing "meaningful" educational benefit, in light of his potential. See Bd.of Education of the Hendrick Hudson Central School District v. Rowley, 458 US 176, 201 (1982), Town of Burlington v. Dept. of Education, 736 F.2d 773, 789 (1st Cir. 1984). That is, a school must consider a child's potential in determining whether an IEP is calculated to provide that child with FAPE. Rowley, supra, at 202, Lessard v. Wilton Lyndeborough Cooperative School District, 518 F3d 18, 29 (1st Cir. 2008). [7]

Education must be provided in the least restrictive environment (LRE) consistent with an appropriate program; that is, students should be placed in more restrictive environments, such as private day or residential schools, only when the nature or severity of the child's disability is such that the child cannot receive FAPE in a less restrictive setting. On the other hand, the opportunity to be educated with non-disabled students does not cure a program that otherwise is inappropriate. School Committee of Town of Burlington v. Dept. of Education of Mass., 471 U.S. 359 (1985).

In a due process proceeding to determine whether a school district has offered or provided FAPE to an eligible child, the burden of proof is on the party seeking to change the status quo. In the instant case, as the moving party challenging the School's proposed IEP and seeking to change Student's placement, Parents bear this burden. That is, in order to prevail, Parents first must prove, by a preponderance of the evidence, that Pembroke's IEP and services are not appropriate, i.e., are not reasonably calculated to provide Student with FAPE. Schaffer v. Weast, 546 U.S. 49, 44 IDELR 150 (2005).

The parties agree that the Student has many strengths, including a kind, caring and friendly personality, at least average intelligence, motivation for learning, ability to comprehend concepts presented orally at least at grade level, and interest and ability in sports and music. There also is no dispute that Student has a significant language-based learning disability that affects his ability to read or write at or near his assigned grade level.

Parents argue that Student has not made effective educational progress because Pembroke's educational program has failed to provide him with the specialized, intensive, individualized programming he needs to address his reading and written language deficits. Parents rely primarily on the testimony and report of Dr. Brefach, who believes that Student remains a non-reader and will not make the reading progress necessary without daily Orton-Gillingham tutorials in the context of a specialized school setting for intelligent students with severe dyslexia.

On the other hand, Pembroke argues that Student can indeed read, has made effective progress, and continues to do so. Pembroke contends that Student made progress in sixth grade, both academically and socially/emotionally (Kiley), and further

---

[7] For an extensive discussion of the FAPE standard, see In Re. Cohasset Public Schools, BSEA 09-4922 (Crane, 2009)

asserts that seventh grade has been even better. Several teachers have testified that Student is an active, enthusiastic member of his class, and that his confidence and skills are growing. They further argue that Student not only does not need a substantially separate setting, because he can comprehend the general curriculum and enjoys middle school life, but he would be harmed by the separation from family, friends, and community if he were to attend a residential school. (Reichenbach)

Based on the evidence, I find that the Parents have met their burden. Student's current IEP and placement provide a plethora of services and accommodations. School personnel who testified clearly are invested in Student's success, are committed to helping him access the curriculum, and have helped Student feel much more positively about himself and his abilities.

A close look at the evidence, however, makes clear that Student still has not acquired the basic reading and writing skills that he will need to succeed academically and live independently, and is not likely to do so prior to the end of his special education eligibility on his current trajectory. After nearly seven years of special education services, including some Wilson training, Student—who is of at least average intelligence--still cannot read much past a third grade level. His most recent standardized testing, administered approximately one year ago, placed him at approximately the second grade level in most measures of reading and writing, and the School has not disputed this finding.

While the record reflects no standardized testing since that time, the DRA reportedly administered shortly before the hearing showed that he had advanced little—if at all—since May of 2011 in his reading level as measured by that instrument. None of Pembroke's witnesses was able to quantify objectively and reliably how much Student's basic reading and writing ability has advanced, if at all, since last school year. The Parent testified that Student still cannot read a menu, a street sign, or write a simple phone message, and this testimony was essentially unrefuted.

Student clearly has absorbed information from the curriculum; he is an intelligent and motivated child with good listening comprehension skills, and he understands and retains information presented to him orally. The record shows, however, that Student relies heavily on accommodations, such as having curricular materials and tests read to him, either by a teacher, Parents, or by a computer program. His tests and assignments are modified. While it is necessary and appropriate to provide accommodations so that Student can access the curriculum, such accommodations cannot be used to substitute for reading remediation. There is no evidence in the record to indicate that the Student lacks potential to significantly improve his reading and writing ability, given appropriate instruction.. Moreover, Student's reported increase in confidence, enthusiasm about school, and participation in classroom discussions and school activities, while positive, are not substitutes for his acquisition of basic reading and writing skills.

Dr. Brefach has emphasized in her testimony that Student requires daily, individual Orton-Gillingham tutoring in order to learn to read and write at a functional

level. The School has objected to some of the language used in Dr. Brefach's report, but has not refuted this conclusion.[8]   (In fact, Ms. Kiley ventured that Student "could benefit" from Orton-Gillingham). In general, hearing officers defer to schools for choice of methodology, except in the unusual situation where the choice of methodology implicates FAPE. This is such a situation. The evidence on the record here overwhelmingly supports Dr. Brefach's conclusion that Student requires this methodology in order to receive FAPE.

While the Parents have met their burden that Student's current IEP and placement in Pembroke are inappropriate, they have not demonstrated that Student needs an unapproved, out-of-state residential placement to provide him with FAPE. Clearly, the Parent has been unable to locate an appropriate placement within commuting distance of home; the programs typically used in these circumstances (Landmark, Carroll, Learning Prep) have been deemed inappropriate for a variety of reasons. This does not mean that no such program could be located by the School, which has more ability and resources to conduct such a search. This search must be concluded within a reasonable time, however, so that Student's placement can be changed accordingly.

### ORDER

Within thirty (30) days from the date of this Decision, the Pembroke Public Schools shall locate or create a public or private educational placement for Student that is a fully-integrated language-based program designed to meet the needs of children with at least average intelligence who have severe dyslexia, and are several years behind their grade level in basic reading and writing skills.

The placement must provide, at a minimum, daily individual Orton-Gillingham tutoring in reading by appropriately qualified staff, as well as corresponding instruction in writing. As in past years, the program shall provide a summer component. Given the Student's skills and interests, the placement should be capable of allowing Student to participate in extracurricular activities such as athletics, if he chooses to do so.

By the Hearing Officer:

---

[8] The School objected to Dr. Brefach's use of the term "functionally illiterate" to describe Student, stating that this is not a clinically valid term in current use. (Blidner) The School also objected to other negative characterizations of its program during Student's early elementary years. Additionally, the School disagreed with Dr. Brefach's portrayal of Student as emotionally fragile, arguing that her test conditions were overly stressful, that Student had been distressed over family stressors and his change of schools, and even that the Student thought Parents wanted him to see himself as less capable than he was. These arguments are irrelevant, because Dr. Brefach's test results were unrefuted and consistent with prior testing by the School. The fact is that whatever Student appeared to be able to do in school, he was unable, at the time of her testing, to demonstrate or generalize those skills under neutral conditions. Literacy skills are of little use if they cannot be applied outside of a very supportive classroom.

Sara Berman

Date:  March 2, 2012